No.  94-474

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995


JERRY PINYERD,

        Petitioner and Appellant,

    v.

STATE COMPENSATION INSURANCE FUND,

        Respondent and Insurer for

PRESTIGE TOYOTA,

        Employer.


APPEAL FROM:    In the Workers' Compensation Court,
                The Honorable Mike McCarter, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            Patrick R. Sheehy, Halverson, Sheehy
            & Plath, Billings, Montana

        For Respondent:

            Daniel J. Whyte, Legal Counsel, State
            Compensation Insurance Fund, Helena, Montana


FILED

Filed: APR 25 1995

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:  February 16, 1995

        Decided:  April 25, 1995

_____
                Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

The claimant, Jerry Pinyerd, filed a petition in the Workers' Compensation Court for the State of Montana in which he sought medical and disability benefits from the State Compensation Mutual Insurance Fund for injuries he alleged were sustained during the course of his employment with Prestige Toyota. After a trial, the Workers' Compensation Court denied Pinyerd's claim for benefits, based on its conclusion that his injury did not arise out of his employment. Pinyerd appeals this conclusion. We reverse the judgment of the Workers' Compensation Court.

The following issue is presented on appeal.

Did the Workers' Compensation Court err when it concluded that the assault which caused Pinyerd's injuries did not arise out of his employment?

### FACTUAL BACKGROUND

Jerry Pinyerd was born and raised in California and moved to Billings in 1993. In June of that year, he began working for Prestige Toyota in Billings. Prestige Toyota is insured against compensation claims by the State Compensation Mutual Insurance Fund (State Fund). On September 18, 1993, while working for Prestige, Pinyerd was involved in an altercation with fellow employee Robert "Jake" Jacobson during which Pinyerd was struck several times and from which he claims he was injured. Pinyerd and Jacobson were the only witnesses called to testify before the Workers' Compensation Court.

2

Both Pinyerd and Jacobson testified that the work environment at Prestige was highly competitive.

Prestige divided its salespeople into two teams which competed against each other, and imposed quota requirements on each member. In addition, team members competed against their own "teammates" for commissions and quotas. Bonuses were paid at the end of each month based on sales volume, and daily sales meetings were held at which each salesperson's progress toward his or her quota was discussed in front of the other sales staff. Pinyerd and Jacobson were salesmen on the same team.

At Prestige, a potential customer who enters the business premises is referred to as an "up." There was no organized system for assigning salespeople to "ups." The first salesperson to reach the "up" got the "up." Prestige offered cash incentives ("spiffs") for test drives and for getting an "up" into the financial office.

Prestige also encouraged "turns." If one salesperson was not making progress with a potential customer, he or she was supposed to "turn" the customer to another salesperson. Any commission was split between the staff involved in the turn.

Pinyerd testified that the staff argued over who was entitled to an "up." Because no organized procedure was established, salespeople would "stash" themselves among the cars to approach "ups." This caused daily conflict among the sales staff.

He also testified that sharing a commission based on a "turn" created problems when one staff member spent more time with the

3

customer than the other. Prestige did not have a formal method for resolving commission disputes. There was additional friction over bad "turns" if one staff member turned a "flake," who would likely never buy a car, over to another staff member simply to waste his or her time so he or she could not compete for other "ups." This and other testimony indicated that Prestige was a highly competitive work environment.

When Pinyerd first arrived at Prestige, he made few sales because he was shut out by the other salespeople. However, after the intervention of management, he became more successful. During July and August he was "hot" at a large Autorama sale with other car dealers. He earned the second largest amount for "spiffs" among 16 salespeople, and a substantial amount for commissions.

Pinyerd testified that Jacobson was resentful of his success. He testified that Jacobson expressed jealousy about his money, car, and property, and that he received bad "turns" from Jacobson.

The two witnesses disagreed about the cause of the altercation that occurred at Prestige's parking lot in September 1993. Pinyerd testified that Jacobson had invited him in for a beer after he drove Jacobson home from work several days earlier, and that while in the home he noticed an open bottle of pills which he advised Jacobson to close and put in a more secure location. Pinyerd stated that he was surprised to learn the following day that Jacobson believed he had stolen some of the pills and was very upset with him.

Jacobson testified that ten pills were missing and that he was furious that Pinyerd stole some of his pills. He added that he knew Pinyerd stole the pills because a co-worker told Jacobson that Pinyerd had a pill. Jacobson claims that his outrage from the alleged theft was the sole cause of his attack on Pinyerd at work several days later.

Pinyerd testified that for several days after he was at Jacobson's, he was informed by others at work that Jacobson was after him. He avoided Jacobson by situating himself in the driver's seat of a pickup truck located on the car lot. On the date that Pinyerd claims he was injured, he states that he saw Jacobson run toward the truck, and that when he reached him, Jacobson started punching him through an open window of the truck. Pinyerd testified that he leaned over to avoid being struck in the face and instead was repeatedly punched in the back and leg. He testified that at some point before or during the attack, Jacobson yelled, "Get off the lot. Get out of this town. You'll never work in this town again. You have no business working here to begin with."

The Workers' Compensation Court found that Jacobson was resentful because he did not accomplish as much as Pinyerd at Autorama. The court also found that Jacobson's testimony was not credible, including his testimony that Pinyerd came to his house for drugs to relieve back pain. The court found that the immediate cause of the assault was Jacobson's belief that Pinyerd stole some

pills, but that resentment about Pinyerd's recent "success in car sales" contributed to Jacobson's general hostility toward Pinyerd. Based on its findings, the court concluded that the assault did not arise out of and in the course of employment as required by § 39-71-407, MCA. Therefore, the court denied Pinyerd's claim for benefits.

<u>DISCUSSION</u>

Did the Workers' Compensation Court err when it concluded that the assault which caused Pinyerd's injuries did not arise out of his employment?

This issue involves the application of Montana law to the facts of this case. Our standard of review of a Workers' Compensation Court's conclusions of law is whether the court's interpretation of the law was correct. *Stordalen v. Ricci's Food Farm* (1993), 261 Mont. 256, 258, 862 P.2d 393, 394 (citing *Martelli v. Anaconda-Deer Lodge* County (1993), 258 Mont. 166, 168, 852 P.2d 579, 580).

Pinyerd contends that the assault occurred in the course of, and arose out of, his employment with Prestige. He claims he was performing his job on his employer's premises when he was assaulted. He adds that *Penny v. Anaconda* Co. (1981), 194 Mont. 409, 632 P.2d 1114, which the Workers' Compensation Court relied on, is factually distinguishable, and that the court misapplied our holding in that case.

6

The State Fund responds that the Workers' Compensation Court correctly applied *Penny,* and correctly concluded that any injuries caused by Jacobson's blows did not arise out of Pinyerd's employment with Prestige.

Section 39-71-407(1), MCA, of the Workers' Compensation Act provides:

> Every insurer is liable for the payment of compensation, in the manner and to the extent provided in this section, to an employee of an employer that it insures who receives an injury <u>arising out of and in the course of employment</u> . . . .

(Emphasis added.)

We note at the outset that the Workers' Compensation Court erroneously concluded that the assault did not occur in the course of employment. The language "in the course of employment," generally refers to the time, place, and circumstances of an injury in relation to employment. *Landeen v. Toole County Refining Co.* (1929), 85 Mont. 41, 54, 277 P. 615, 620. The injury here was in the course of employment because it occurred on the employer's car lot, during work hours, when both Pinyerd and Jacobson were supposed to be performing work duties. The critical question is whether the assault "arose out of" employment. The phrase "arising out of" is related to the concept of causation. See 1 Arthur Larson, *Workmen's Compensation Law,* § 6.10 (1993) *; see also Landeen,* 277 P. at 620 (stating that the words "out of" point to the cause of the accident and are descriptive of the relationship between the injury and employment).

7

Our decision in Penny involved an assault in the workplace. Penny was an employee who was involved in a fight with a co-worker that occurred on the employer's premises. The hearing examiner found that Penny started the fight solely to gratify personal feelings of hatred or anger toward a co-worker. The hearing examiner also found that the fight was not connected to a disagreement that had occurred over union policies four years earlier. Based on findings that the fight resulted from personal animosity unrelated to employment, the hearing examiner concluded that the injuries from the fight did not arise out of Penny's employment. The Workers' Compensation Court adopted these findings and conclusions as its basis for its judgment, and Penny appealed. *Penny, 632* P.2d at 1116-17.

In this Court's opinion, we held that pursuant to § 39-71-407, MCA, an injury must arise out of and occur in the course of employment before it is compensable. *Penny, 632* P.2d at 1116. We stated that unless a reasonably immediate service to the employer is discernible, the determination of "whether an injury arises out of and occurs in the scope of employment is controlled by the particular facts and circumstances of each case." *Penny, 632* P.2d at 1116-17 (citing *Guarascio v. Industrial Accident Board* (1962), 140 Mont. 497, 502, 374 P.2d 84, 86). We recognized that there are two lines of authority regarding work-connected assaults in which conditions of employment place employees under strain. *Penny, 632* P.2d at 1117

8

(citing 1 Larson, *Workmen's Compensation Law,* § 11.16). We followed the rule set forth by the Connecticut Supreme Court in *Willis v. Taylor & Fenn Co.* (Conn. 1951), 79 A.2d 821, 822, which provides that:

> "'The fact that employees **sometimes** quarrel and fight while at work does not make the injury which may result one which arises out of their employment. There must be <u>some reasonable connection between the injury suffered and the employment or the conditions under which it is pursued.</u>'"

(Emphasis added.) The Court in *Penny* held that substantial evidence supported the finding that the fight was not reasonably connected to Penny's employment. *Penny,* 632 P.2d at 1117.

In *Penny* and *Willis,* the fact finders found that the claimant was the aggressor. In *Penny,* the hearing examiner found that Penny was motivated solely by feelings of personal animosity and hatred. In this case, Pinyerd was not the aggressor, nor were Jacobson's feelings of animosity unrelated to the conditions under which he and Pinyerd pursued their employment at Prestige.

While the Workers' Compensation Court found that the precipitating cause of Jacobson's assault was his belief that Pinyerd had stolen pills from him, the court also found that Jacobson's resentment of Pinyerd's success in car sales contributed to his general hostility toward Pinyerd.

Pursuant to our decision in *Penny,* the issue is not simply what precipitated Jacobson's assault, but whether there was a reasonable connection between Pinyerd's injury and the conditions under which

he pursued his employment. That connection was established when the court found that Jacobson's hostility toward Pinyerd was contributed to by his resentment of Pinyerd's sales success.

Jacobson and Pinyerd met because of their employment at Prestige. They had to compete against each other for sales quotas and commissions without any organized framework within which to compete. Evidence established that Prestige's policies created daily friction among its sales staff and were substantial cause for animosity.

Since this underlying animosity was caused in part by the employer's policies, it was incidental to a salesperson's duties.

For these reasons, we conclude that Jacobson's assault of Pinyerd which occurred on September 18, 1993, did "arise out of" and occur in the course of his employment with Prestige Toyota. We reverse the judgment of the Workers' Compensation Court and remand for further proceedings consistent with this opinion.

_____
Justice

We concur:

_____
Chief Justice

_____